BERG v. HESSEY.

1. VENDOR AND PURCHASER—RESCISSION—SUMMER RESORT.

Vendees of summer resort property who purchased for resale of platted lots *held,* to have waived right to rescind for alleged false representations as to value and probable resale value by subsequent acts with respect to the property, where they are unable to restore *status quo,* are estopped, and guilty of laches in waiting five years before bringing suit.

2. CONTRACTS—RESCISSION—FRAUD.

Rescission is not a vent for bad bargains unless induced by fraud, and not then unless promptly disaffirmed after discovery of the fraud.

Appeal from Muskegon; Vanderwerp (John), J. Submitted June 14, 1934. (Docket No. 50, Calendar No. 37,833.) Decided October 1, 1934.

Bill by Oscar Berg, individually and as trustee, and Gerald Stufflebeam against Marie Hessey for rescission of purchase of lands. Cross-bill by defendant Hessey against plaintiffs and defendant Alvin L. Jackson for foreclosure of mortgage. Decree for plaintiffs. Defendant Hessey appeals. Reversed, bill dismissed and case remanded for proceedings under cross-bill.

*Alexis J. Rogoski,* for plaintiffs.

*William H. Messinger* and *Dean S. Face,* for defendant Hessey.

WIEST, J. In 1926 there was a boom in real estate for summer resort subdivision purposes in lake regions in western Michigan, and especially in the vicinity of Muskegon. In 1925 defendant Marie Hessey and Charles Hessey, her husband (now deceased), purchased about 100 acres of farm land near Lake Michigan and touching Black lake, 60 acres lying in Muskegon county and the adjoining parcel in Ottawa county. They purchased at an executor's sale and paid $5,000 in cash for the property. They engaged the services of defendant Alvin L. Jackson in planning a plat, subdividing the 60 acres in Muskegon county. The plat, showing 603 lots, was prepared but not recorded. Some of the lots were sold under land contracts by the Hesseys. In the fall of 1926, Mr. Jackson made contact with plaintiff Gerald Stufflebeam, then captain of a vessel on Lake Michigan, and plaintiff Oscar Berg, then clerk of Muskegon county, and they became inter-

ested in the possibilities of the property for sale for resort purposes. Plaintiffs viewed the property and claimed that Mr. Jackson represented it could be purchased by the three for $22,700, of which he would at once pay $5,000, and that the three could purchase and sell lots and probably realize $60,000 from the 60-acre parcel and $40,000 from the remainder. Mr. Jackson showed plaintiffs the plat but said nothing about it being unrecorded and plaintiffs did not give it much attention although, at that time, Mr. Berg, by virtue of his office as county clerk, was a member of the board having approval of plats. The three agreed to make the purchase and share in the contemplated profits and, November 12, 1926, entered into a land contract with the owners for the purchase at the sum of $22,700.

The contract recited an agreement by the vendees therein "to pay * * * $10,700 at the delivery of this contract, the receipt of which is hereby acknowledged, said amount consisting of $5,000 already paid in by A. L. Jackson, $2,700 to be paid in cash, and six notes of $500 each, * * * and the balance of the purchase price, $12,000 to be paid" in instalments of $2,000 each.

The acknowledged payment by Mr. Jackson was in satisfaction of services previously rendered the vendors in and about this property.

The purchasers found the prepared plat, because of narrow streets and small lots, would not be approved and caused a survey to be made and a new plat to be prepared and it was approved and recorded some time in 1927. This rearrangement necessitated adjustment with purchasers under the old plat and this was accomplished. Efforts were then made to sell lots and some were sold and suitable papers executed by the vendors.

In December, 1926, the vendees entered into an agreement with Forde and Anderson of Chicago, for the sale of the lots on commission and placed the selling price upon each lot. May 12, 1928, the vendees in the land contract, upon executing a mortgage on the property to the vendors for $12,000, received a deed, and May 26, 1928, the grantees entered into a written agreement constituting plaintiff Berg trustee to manage the property. Thereafter plaintiffs and Mr. Jackson continued efforts to sell lots but encountered a rapid decline in value and found no demand for lots and this continued until, in 1931, there was no demand for lots. Plaintiffs and Mr. Jackson gave the wife of Mr. Stufflebeam a mortgage for $1,000 on out-lot A, which contained about an acre of land with a farmhouse on it.

In March, 1931, plaintiffs claim they first learned that they had been defrauded by the false representations of Mr. Jackson and made verbal offer to surrender the property upon discharge of their obligations. Upon declination, plaintiffs filed the bill herein to obtain rescission and Mrs. Hessey, by cross-bill, asked for foreclosure of the mortgage. The court granted rescission, together with nullification of Mrs. Hessey's mortgage and validation of Mrs. Stufflebeam's mortgage, and gave plaintiffs a personal decree against Mrs. Hessey for $10,401.01, "less the interest due on the mortgage held by Margaret Stufflebeam, being from January 15, 1928, to the date fixed for said payment," awarded execution against Mrs. Hessey and a lien on the property, except out-lot A.

In an opinion the circuit judge found that the land in Muskegon county—"was not fit for sale at a profit for subdivision purposes, and was not worth $60,000, but was worth not over $6,500, and for agricultural purposes mostly," and that Mr. Jackson misrepre-

sented the property in all the particulars claimed; that plaintiffs were deceived thereby to their damage and that they acted promptly after discovery of the fraud.  Defendant Marie Hessey reviews by appeal.

Upon the question of prospective profits the testimony of plaintiff Berg is illuminative.  He said:

"I knew there was a boom going on in west Michigan resort property.  *  *  *  I know that there was a rapid decline in 1927 and 1928 so far as this property was concerned.  *  *  *

"The purpose of going into this transaction was to attempt to make some money from it as an investment, one-third of whatever the property might develop.  I knew there was nothing sure or certain about that.  I knew that no one was guaranteeing me the property would sell for $100,000."

Mr. Stufflebeam testified that Mr. Jackson said:

"The platted portion of that property ought to sell for $60,000.  *  *  *  He said, approximately, as I remember it, $60,000 it ought to sell for.  And at that time he also told us the 40 acres over in Ottawa county, when it was platted, ought to sell for $40,000, or approximately that.  He told us that he would sign these notes or contracts or whatever was to be prepared and he would be able to meet his part of the obligation.  He didn't tell us how he would be able to meet it or of any particular pieces of property he owned anywhere, or how much money he had in the bank, or state what his income was."

He also testified:

"When Mr. Jackson first started to talk to me, I didn't know how the Hesseys acquired this property. What I was interested in was the chance to make money on this property myself.  It didn't interest me whether the Hesseys made a profit or not, not necessarily.  If I got the property cheap enough and

could sell it and make money enough, that is what I was interested in. I didn't care if Mr. and Mrs. Hessey inherited this property and got it for nothing.''

The plaintiffs held this property for over five years, and we have set up the use they made of it. They now claim that they did not discover they had been defrauded until in March, 1931, when they talked with Glenn Porter, a real estate man of Muskegon, and were informed by him that he did not think there was much sale for the land and he thought they had paid altogether too much for it.

If any fraudulent representations were made (which is extremely doubtful) they were by Jackson, who was accepted as an associate and became a party to the purchase and subsequent management. We are satisfied that, even if there were any misrepresentations, plaintiffs, by their subsequent acts, have waived right to rescission by affirmative action, have been guilty of laches, are in no position to restore the *status quo* and are estopped.

We find no testimony tending to show the credit of $5,000, accorded Jackson, was a fictitious one and, therefore, a fraud upon plaintiffs. There was no representation that the first plat was recorded and, upon its face, disclosed it had not been recorded.

It is inconceivable that plaintiffs, during a trial of five years to dispose of the lots, were not aware of their bad bargain until informed by Mr. Porter. Plaintiffs, by their own acts in selling lots, have rendered it impossible to restore the property to Mrs. Hessey.

Plaintiff Berg was no gullible novice. He was county clerk at the time of the purchase, and at the time of the hearing, and had been register of deeds. He was well aware of the demand, in 1926, for resort

lots and the boom leading to many, later found, ill-advised subdivisions and, when the slump came, he was caught like many others who had had dreams of sudden wealth.

There was no representation that the plat, exhibited by Jackson, had been approved and recorded. Plaintiffs knew in 1927 that it had not been approved for they had a survey made and a new plat executed and recorded and, for about four years thereafter, operated in accordance therewith without murmer.

The new plat commanded readjustment with purchasers of lots under the old descriptions and plaintiffs then knew the number of lots previously sold and did not demur.

Plaintiffs did not claim that Jackson represented the property to be worth $100,000 at the time of the purchase, but only that it ought to bring such an amount in the sale of lots. The slump, commencing in 1927, rendered any and all possibility of such realization utterly impossible, yet plaintiffs carried on without complaint of fraudulent estimate of probable gain.

Out-lot A was sold by plaintiffs for $3,500, but was taken back and is now subject to the mortgage, as before mentioned, to Mrs. Stufflebeam. About 80 lots have been sold, the lowest price being $148; however, with small down payments.

Plaintiffs evidently made a bad bargain, considering the slump, but endeavored to make the best of it, and they did not need to wait for upwards of five years to be told that they had made a bad bargain.

Rescission is not a vent for bad bargains unless induced by fraud, and not then, unless promptly disaffirmed after discovery of the fraud.

The court was in error in granting rescission and the decree is reversed and the bill dismissed, with costs to Mrs. Hessey.

Under her cross-bill Mrs. Hessey is entitled to decree of foreclosure of the mortgage and to that end proceedings under the cross-bill are remanded to the circuit court.

NELSON SHARPE, C. J., and POTTER, NORTH, FEAD, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.