# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MEEMIC INSURANCE COMPANY v FORTSON

Docket No. 158302. Argued November 6, 2019 (Calendar No. 2). Decided July 29, 2020.

Meemic Insurance Company brought an action in the Berrien Circuit Court against Louise M. Fortson and Richard A. Fortson, individually and as conservator of their son, Justin Fortson, alleging that Richard and Louise had fraudulently obtained payment for attendant-care services they did not provide to Justin. Richard and Louise were named insureds on a no-fault insurance policy issued by Meemic. Justin was considered an insured person under the policy because he was a "resident relative" as defined by the policy and because under MCL 500.3114(1) of the no-fault act, MCL 500.3101 *et seq.*, he was a relative domiciled in the same house as a named insured. The policy contained an antifraud provision stating that the policy was void if any insured person intentionally concealed or misrepresented any material fact or circumstance relating to the insurance, the application for it, or any claim made under it. In 2009, Justin was injured when he fell from the hood of a motor vehicle, necessitating constant supervision and long-term care. Richard and Louise opted to provide attendant care to Justin in their home on a full-time basis. Justin received benefits under his parents' no-fault policy with Meemic, and from 2009 until 2014, Louise submitted payment requests to Meemic for the attendant-care services she and her husband provided, asserting that they provided full-time supervision; Meemic routinely paid the benefits. In 2013, Meemic investigated Richard and Louise's supervision of Justin and discovered that they had not provided him with daily direct supervision; in fact, Justin had been periodically jailed for traffic and drug offenses and had spent time at an inpatient substance-abuse rehabilitation facility at times when Richard and Louise stated they were providing full-time supervision. Meemic terminated Justin's no-fault benefits and filed suit, asserting claims of breach of contract, fraud, common-law statutory conversion, and unjust enrichment. Meemic alleged that Louise and Richard had fraudulently represented the attendant-care services they claimed to have provided and sought to void the policy under its contractual antifraud provision, terminate any future liability for benefits, and require Louise and Richard to reimburse Meemic for the fraudulent attendant-care statements. Louise and Richard counterclaimed, arguing that Meemic breached the insurance contract by terminating Justin's benefits and refusing to pay for attendant-care services. Meemic moved for summary disposition, and the court, John M. Donahue, J., initially denied the motion, reasoning that under the innocent-third-party rule, Meemic could not rescind the policy on the basis of fraud to avoid liability for benefits owed to Justin, an innocent third party. Meemic moved for reconsideration of that decision after the Court of Appeals later concluded in *Bazzi v*

*Sentinel Ins Co*, 315 Mich App 763 (2016),[1] that the innocent-third-party rule was no longer good law. On reconsideration, the trial court granted summary disposition in favor of Meemic. Louise and Richard appealed. The Court of Appeals, MARKEY, P.J., and M. J. KELLY, J. (CAMERON, J., dissenting), reversed, first reasoning that *Bazzi* did not apply because the fraud in this case did not occur in the procurement of the policy and did not affect the validity of the contract. The Court concluded, however, that the policy's antifraud provision was invalid because it would enable Meemic to avoid the payment of personal protection insurance (PIP) benefits mandated by MCL 500.3105. Judge CAMERON, dissenting, would have affirmed the trial court's grant of summary disposition to Meemic because the policy permitted rescission on the basis of fraud and fraud had occurred. 324 Mich App 467 (2018). The Supreme Court granted Meemic's application for leave to appeal. 503 Mich 1031 (2019).

In an opinion by Justice VIVIANO, joined by Chief Justice MCCORMACK, and Justices MARKMAN, BERNSTEIN, and CAVANAGH, the Supreme Court *held*:

A no-fault insurance policy may contain contractual defenses to benefits mandated by the no-fault act if the defense is provided by the act or the contractual defense is based on a common-law defense that has not been abrogated by the act; a policy provision may not go beyond either statutory or common-law defenses to limit mandatory coverages to a greater extent than either the act or the common law. Meemic did not assert one of the statutory defenses allowed by the no-fault act, and the contract-based fraud defense was not the type of common-law fraud defense that would allow for rescission, the remedy most analogous to that sought under the antifraud provision. Accordingly, the antifraud provision was unenforceable.

1. With regard to motor vehicle insurance policies, the no-fault act governs the coverages that are mandated by the act. Because MCL 500.3105 provides that PIP benefits are mandatory, the act controls any questions regarding the award of those benefits. In contrast, coverages that are not required by the no-fault act (that is, optional coverages) are controlled by the language of the insurance policy. With regard to optional coverage, a court must construe and apply unambiguous contract provisions as written unless the provision violates a law or one of the traditional defenses to the enforceability of a contract applies; that is, unambiguous insurance policies are not open to judicial construction and must be enforced according to their unambiguous terms unless doing so would violate law or public policy. Common-law defenses that have not been abrogated by the no-fault act are available against claims for coverage mandated by the act. Accordingly, a contractual defense to mandatory benefits under the no-fault act is valid and enforceable when the defense is provided by the act itself or when the contractual defense is based on a common-law defense that has not been abrogated by the act; thus, an insurer may include common-law defenses that have not been abrogated by the act in an insurance policy. However, an insurance policy may not go beyond either statutory or common-law defenses to limit mandatory coverage to a greater extent than either the act or the common law; to hold otherwise would improperly reduce the scope of mandatory coverage required by the no-fault act. Therefore, a provision in an insurance policy that purports to set forth a defense to a claim for mandatory coverage is valid and enforceable only to the extent it contains a defense available under the no-fault act or a common-law defense that has not been abrogated.

---

[1] Aff'd in part and rev'd in part 502 Mich 390 (2018).

2. If a contract is obtained as a result of fraud or misrepresentation, a party may be entitled to a legal or equitable remedy. At common law, the defrauded party could only seek to rescind the contract, that is, avoid the transaction, if the fraud related to the inducement or inception of the contract. While a contractual provision that rescinds a contract because of postprocurement fraud is not invalid in all circumstances—specifically, the clause would be valid as applied to a party's failure to perform a substantial part of the contract or one of its essential terms—in general, the mere breach of a contract would not entitle the injured party to avoid the contract at common law.

3. In this case, because Meemic did not assert one of the statutory defenses allowed by the no-fault act, the question was whether its contract defense, the antifraud provision, provided for relief that would have been available under an unabrogated common-law defense; the now-abrogated innocent-third-party rule was, therefore, not relevant with regard to resolving the case. The antifraud provision provided that Meemic could terminate benefit payments to Justin on the basis of the fraudulent activity of anyone who happened to be in or out of the car and entitled to claim under the policy, and the activity could occur years after the policy was entered and relate to any claim or simply to the insurance. The common-law remedy of rescission was the closest analogue to Meemic's contract-based defense. Applying the law of rescission, the allegedly fraudulent claims did not induce Meemic to enter into the policy, did not deceive Meemic as to the policy's content, and there was no argument or evidence that Richard and Louise's misrepresentations regarding attendant care constituted a failure to perform a substantial part of the contract or an essential term such that Meemic could have sought rescission instead of bringing an action for damages. Meemic's contract-based fraud defense thus failed because it was not the type of common-law fraud defense that would allow for rescission, and the contract-based defense was, therefore, unenforceable. The concurrence's reliance on MCL 500.3220 is misplaced because (1) Meemic did not seek to cancel the policy under that statute and the statute did not apply to the facts of the case, (2) Meemic did not seek to cancel the policy but, instead, to void coverage and stop paying Justin's PIP benefits, and (3) MCL 500.3220 does not abrogate common-law rescission in the context of this case. The concurrence's theory also directly conflicts with *Titan Ins Co v Hyten*, 491 Mich 547 (2012), which rejected the assertion that MCL 500.3220 abrogated the common-law defense of rescission. And the concurrence's analysis does not consider *Bazzi v Sentinel Ins Co*, 502 Mich 390 (2018), and *Marquis Hartford Accident & Indemnity (After Remand)*, 444 Mich 638 (1994), which held that fraud and other common-law defenses have not been abrogated by the no-fault act. In addition, the concurrence also misreads 500.3148(2) and offers no support of its apparent inference that the provision's lack of express permission to void the policy constitutes an affirmative prohibition on voiding policies based on fraud.

Court of Appeals judgment affirmed in result only, Court of Appeals opinion vacated, and case remanded to the trial court for further proceedings.

Justice ZAHRA, joined by Justice CLEMENT, concurring, agreed with the majority that the antifraud provision was unenforceable in this case but wrote separately to express disagreement with the majority's analysis, specifically, with its conclusion that the state's common law had to be analyzed to arrive at the same result. The majority improperly suggests that Michigan's common law and the no-fault act are the only authorities that may be employed to determine the validity of a provision in a no-fault policy. Instead, the approach set forth in *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588 (2002)—that no-fault policy provisions are allowed if they facilitate the goals of the act and are harmonious with the Legislature's no-fault insurance

regime—is the correct framework to address the issue in this case and should be reaffirmed. MCL 500.3220 limits the ability of a licensed insurer to cancel automobile coverage after a policy has been in effect for at least 55 days. Because Meemic did not do so, the statute plainly prohibited Meemic from thereafter canceling the policy, including by operation of the antifraud provision. The no-fault act also grants insurers a limited right to challenge claims for PIP benefits because they must only pay those claims that are reasonably necessary; by definition, fraudulent charges are neither reasonable nor necessary. MCL 500.3148(2), the only provision in the no-fault act that addresses a claimant's fraudulent proofs of loss for PIP benefits, suggests that an insured remains entitled to PIP benefits even after the insured has filed a fraudulent charge. Under the *Cruz* approach, because the no-fault act provides a remedy for fraudulent proofs of loss and contemplates that PIP benefits continue even when prior fraud is proved, the antifraud provision in this case contradicts the no-fault act and is unenforceable. Moreover, the provision thwarts the goal of the no-fault act to provide motor vehicle crash victims with assured, adequate, and prompt reparation for certain economic loss. The majority's holding is overly broad, and its approach for determining whether contract language in a no-fault policy is viable may place unwarranted constraints on the right to contract. Its approach erodes the scheme set forth in *Cruz* because it only considers whether the antifraud provision is expressly permitted under the no-fault act or the common law, leaving no room for the policy language to do any work. The majority's approach also ignores that insurers may insert provisions into a no-fault policy that are not rooted in the common law or referred to in the no-fault act. Even if the majority were correct that the antifraud provision was a contract-based fraud defense that contemplates the remedy of rescission, MCL 500.3220 would prevent Meemic from canceling, let alone rescinding the policy; the statute provides a limited path for an insurer to cancel a policy, and Meemic failed to follow that path. The antifraud provision would improperly allow Meemic to expand that path by allowing it to void or cancel the policy in a way not expressly provided by the statute. Moreover, Meemic did not seek to rescind the contract, and the majority's holding is, therefore, incorrectly premised on an analysis of the right of rescission. Regardless, the no-fault act expressly prohibited Meemic from exercising the provision to cancel the policy, let alone from seeking a greater remedy than allowed by the act. Moreover, the term "void' in the antifraud provision is insufficiently similar to rescission given that the meaning of rescission is distinct from the meaning of "void" and rescission encompasses a broader range of contractual remedies. Justice ZAHRA would have applied the approach set forth in *Cruz* and held that the antifraud provision was inconsistent with the no-fault act because it attempted to expand the limited path for cancellation set forth in MCL 500.3220 and the provision was, therefore, void as against public policy.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 29, 2020

STATE OF MICHIGAN

SUPREME COURT

MEEMIC INSURANCE COMPANY,

       Plaintiff/Counterdefendant-
       Appellant,

v                                      No. 158302

LOUISE M. FORTSON and RICHARD A.
FORTSON, Individually and as Conservator
for JUSTIN FORTSON,

       Defendants/Counterplaintiffs-
       Appellees.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

In this action, Meemic Insurance Company seeks to void its policy with defendants Louise and Richard Fortson and stop paying no-fault benefits to their son. Although the benefits are mandated by statute, Meemic seeks to avoid its statutory obligations by enforcing the antifraud provision in the policy. The issue before the Court is the extent to which a contractual defense like the one here is valid and enforceable when applied to

coverage mandated by the no-fault act, MCL 500.3101 *et seq*. We hold that such contractual provisions are valid when based on a defense to mandatory coverage provided in the no-fault act itself or on a common-law defense that has not been abrogated by the act. Because Meemic's fraud defense is grounded on neither the no-fault act nor the common law, it is invalid and unenforceable. Accordingly, we affirm the Court of Appeals on different grounds and remand the case to the trial court for further proceedings consistent with this opinion.[1]

## I. FACTS

In September 2009, defendant Justin Fortson suffered serious injuries when he fell from the hood of a moving automobile. Most significantly, brain damage left him in need of constant supervision. Doctors prescribed long-term care. Rather than sending Justin to a brain-injury rehabilitation center, Justin's parents, codefendants Richard and Louise Fortson, opted to provide 24-hour-a-day attendant care themselves.

At the time of the accident, Meemic provided no-fault coverage to Justin and his parents. Richard and Louise were the named insureds in the policy. But Justin was also an "insured person" under the policy's "resident relatives" provision and under MCL 500.3114(1).[2] Meemic agreed to pay the parents $11 an hour to provide attendant-care

---

[1] Given our disposition of this case, we need not reach the remaining issues raised by Meemic.

[2] MCL 500.3114(1) provides:

> Except as provided in subsections (2), (3), and (5), a personal protection insurance policy described in section 3101(1) applies to accidental bodily injury to the person named in the policy, the person's spouse, and a

services to Justin and requested that the Fortsons send Meemic monthly bills documenting actual hours spent providing care. From October 2009 to October 2014, Justin's parents submitted bills for attendant care, and Meemic paid them. In May 2013, however, the insurance company began a formal investigation. The investigation revealed that between September 2012 and July 2014, Justin had been in jail for 233 days and in drug rehabilitation for another 78 days. During this period, Justin's parents had continued to bill Meemic for attendant care.

Meemic's current suit against Richard, Louise, and Justin seeks to void the policy pursuant to the policy's antifraud provision so that Meemic is no longer required to pay Justin's claim.[3] The antifraud provision provides:

> This entire policy is void if any **insured person** has intentionally concealed or misrepresented any material fact or circumstance relating to:
>
> A. This insurance;
>
> B. The Application for it;
>
> C. Or any claim made under it.

---

relative of either domiciled in the same household, if the injury arises from a motor vehicle accident.

[3] In 2010, Meemic canceled the insurance policy for unrelated reasons. Because the cancellation was prospective, it had no effect on Justin's claim regarding his accident, which had occurred before the cancellation. See *Meemic Ins Co v Fortson*, 324 Mich App 467, 479-481; 922 NW2d 154 (2018), citing *Stine v Continental Cas Co*, 419 Mich 89, 98; 349 NW2d 127 (1984). Meemic's amended complaint included a claim of unjust enrichment, seeking restitution for payments made on the basis of the Fortsons' fraud. That issue was not raised by the Fortsons in this appeal, and our opinion does not address the matter.

For the no-fault coverages, "Insured Person(s)" is defined under the policy to include the named insureds, who were Louise and Richard; any "resident relative," which included Justin; and "any other person occupying the Insured motor vehicle, or any person, subject to the priorities set forth in the [no-fault act], injured as a result of an accident involving the Insured motor vehicle while not occupying any motor vehicle." (Emphasis omitted.) The complaint claims breach of contract, fraud, common-law and statutory conversion, and unjust enrichment. Meemic sought damages and a determination that defendants' actions voided the insurance policy. The Fortsons filed a counterclaim for the past and future attendant-care benefits that Meemic was refusing to pay.

Meemic moved for summary disposition, asking the trial court to enter an order that would void the insurance policy under the policy's antifraud provision, terminate any future liability, and require the Fortsons to reimburse Meemic for the fraudulent attendant-care statements. The trial court initially denied the summary disposition motion on the basis of the innocent-third-party rule, under which an insurer could not rescind a contract on the basis of fraud to avoid liability for benefits owed to innocent third parties. But Meemic moved for reconsideration after the Court of Appeals issued its opinion in *Bazzi v Sentinel Ins Co*, 315 Mich App 763; 891 NW2d 13 (2016), aff'd in part and rev'd in part 502 Mich 390 (2018), which concluded that the innocent-third-party rule was no longer good law. The trial court subsequently granted Meemic's motion for summary disposition.

The Court of Appeals reversed, concluding that its decision in *Bazzi* was inapplicable because the fraud here did not occur in the procurement of the policy—it did not, in other words, induce Meemic to enter into the contract with the Fortsons—and thus the fraud did not affect the validity of the contract. *Meemic Ins Co v Fortson*, 324 Mich

4

App 467, 475-476 & 476 n 1; 922 NW2d 154 (2018). The Court held that the policy's antifraud provision was invalid because it would enable Meemic to circumvent the payment of statutorily mandated benefits. *Id*. at 477-479. It went on to conclude that even if the antifraud provision were valid, at the time they committed fraud, Richard and Louise were no longer "insured persons" under the policy, so the antifraud provision did not apply. *Id*. at 479-484. Judge CAMERON dissented, arguing that the majority had impermissibly resurrected the innocent-third-party rule. *Id*. at 485-487 (CAMERON, J., dissenting). Because the policy permitted rescission on the basis of fraud and fraud occurred here, Judge Cameron would have affirmed the trial court's grant of summary disposition to Meemic. *Id*. at 489-493.

We granted Meemic's application for leave to appeal. *Meemic Ins Co v Fortson*, 503 Mich 1031 (2019).

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366; 817 NW2d 504 (2012). In addition, statutory interpretation is an issue of law, which we also review de novo. *Cardinal Mooney High Sch v Mich High Sch Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991). To the extent this case involves the interpretation of an insurance policy, insurance policies are interpreted like any other contract. See *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999) ("The principles of construction governing other contracts apply to insurance policies. Where no ambiguity exists, this Court enforces the contract as written.") (citation omitted). Like with other contracts,

5

"[a]ny clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy." *Id*. at 568 (quotation marks and citation omitted).

## III. ANALYSIS

We have described the utopian aims of Michigan's no-fault act as follows:

> The Michigan No-Fault Insurance Act, which became law on October 1, 1973, was offered as an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or "fault") liability system. The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses. The Legislature believed this goal could be most effectively achieved through a system of *compulsory* insurance, whereby every Michigan motorist would be required to purchase no-fault insurance or be unable to operate a motor vehicle legally in this state. Under this system, victims of motor vehicle accidents would receive insurance benefits for their injuries as a substitute for their common-law remedy in tort. [*Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978).]

Whether the no-fault act has lived up to its billing is the subject of an ongoing and vigorous policy debate.[4] But one thing that is not open to debate is that the act governs the coverages it mandates, and the insurance policy controls coverages that are optional (i.e., not required by the act):

> [Personal protection insurance (PIP)] benefits are mandated by statute under the no-fault act, MCL 500.3105; MSA 24.13105, and, therefore, the statute is the "rule book" for deciding the issues involved in questions regarding awarding those benefits. On the other hand, the insurance policy itself, which is the contract between the insurer and the insured, controls the interpretation

---

[4] The Legislature passed major changes to the no-fault act in 2019. The act took immediate effect, but certain provisions did not become operative until later dates. See Public Acts 21 and 22 of 2019. The changes are not pertinent to this action, and all references in this opinion are to the version of the no-fault act in effect before the amendments.

of its own provisions providing benefits not required by statute. [*Rohlman v Hawkeye-Security Ins Co*, 442 Mich 520, 524-525; 502 NW2d 310 (1993).][5]

In a footnote in *Rohlman*, we explained why the no-fault act governs the coverages mandated by the act:

> The policy and the statutes relating thereto must be read and construed together as though the statutes were a part of the contract, for it is to be presumed that the parties contracted with the intention of executing a policy satisfying the statutory requirements, and intended to make the contract to carry out its purpose.

> A policy of insurance must be construed to satisfy the provisions of the law by which it was required, particularly when the policy specifies that it was issued to conform to the statutory requirement; and where an insurance policy has been issued in pursuance of the requirement of a statute which forbids the operation of a motor vehicle until good and sufficient security has been given, the court should construe this statute and the policy together in the light of the legislative purpose. [12A Couch, Insurance, 2d (rev ed), § 45:694, pp 331-332.]

> The definition[s] in an automobile liability insurance policy required by statute, of the motor vehicles covered by it, [are] to be construed with reference to statutes with which it was intended to comply . . . . [*Id.*, § 45:695, p 333.]

> We think the same would hold true for no-fault policies. [*Rohlman*, 442 Mich at 525 n 3 (alterations in original)].

---

[5] See also *Cohen v Auto Club Ins Ass'n*, 463 Mich 525, 531; 620 NW2d 840 (2001) ("The Legislature requires a Michigan motorist to maintain a no-fault policy that includes certain elements mandated by law. Those required coverages are the bedrock of the no-fault system and, as we have held on many occasions, are not subject to removal by policy language that conflicts with the statute."); *Husted v Auto-Owners Ins Co*, 459 Mich 500, 512; 591 NW2d 642 (1999) ("This Court has indicated that a policy exclusion that conflicts with the mandatory coverage requirements of the no-fault act is void as contrary to public policy."), citing *Citizens Ins Co of America v Federated Mut Ins Co*, 448 Mich 225, 232; 531 NW2d 138 (1995).

In *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005), an optional-coverage case involving a claim for uninsured motorist benefits, we held that "unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." In particular, we held "that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy . . . [and that a] mere judicial assessment of 'reasonableness' is an invalid basis upon which to refuse to enforce contractual provisions." *Id*. at 470. We noted that "[e]xamples of traditional defenses include duress, waiver, estoppel, fraud, or unconscionability." *Id*. at 470 n 23; see also *Titan Ins Co v Hyten*, 491 Mich 547, 554; 817 NW2d 562 (2012) ("[B]ecause insurance policies are contracts, common-law defenses may be invoked to avoid enforcement of an insurance policy, unless those defenses are prohibited by statute.").

In the context of mandatory benefits, the Court has also addressed whether common-law defenses remain available. In *Marquis v Hartford Accident & Indemnity* (*After Remand*), 444 Mich 638, 652; 513 NW2d 799 (1994), we held "that the common-law rule requiring an injured party in a contract or tort action to mitigate damages applies in suits for work-loss benefits under the no-fault act." And in *Bazzi v Sentinel Ins Co*, 502 Mich 390, 400-401; 919 NW2d 20 (2018), this Court held that a common-law fraudulent-procurement defense may be raised to a claim for coverage mandated by the no-fault act.[6]

---

[6] In *Bazzi*, because the plaintiff was a relative domiciled in the same household as the policyholder, he was entitled to no-fault benefits under MCL 500.3114(1).

8

Thus, we have stated that to the extent that common-law defenses remain in force and effect, they may apply in certain circumstances to claims for mandatory coverage.[7]

---

[7] The extent to which the no-fault act abrogated common-law defenses to claims for mandatory benefits remains something of an open question. In *Titan*, 491 Mich at 554, this Court noted that these defenses apply unless they are "prohibited by statute." That makes sense in cases like *Titan* that involve claims for optional coverage (i.e., coverage above the minimum liability amount required by the no-fault act). *Id*. at 552 n 2. In those cases, we have said that the policy is "construed without reference to the no-fault act . . . ." *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 533; 676 NW2d 616 (2004); see also *Rory*, 473 Mich at 466 ("[T]he rights and limitations of such coverage are purely contractual and are construed without reference to the no-fault act."). Accordingly, "the insurance policy itself, which is the contract between the insurer and the insured, controls the interpretation of its own provisions providing benefits not required by statute." *Rohlman*, 442 Mich at 525. Thus, like with other contracts, "[a]ny clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy." *Farm Bureau Mut Ins Co of Mich*, 460 Mich at 568 (quotation marks and citation omitted); see also *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594; 648 NW2d 591 (2002) ("[W]here contract language is neither ambiguous, nor contrary to the no-fault statute, the will of the parties, as reflected in their agreement, is to be carried out, and thus the contract is enforced as written."). So a more precise statement of our rule is that when optional coverage is involved, the policy is construed without reference to the no-fault act, except that a court may look to see if the contract language contravenes the no-fault act or other sources of public policy in determining whether the contract language is enforceable.

*Bazzi*, 502 Mich at 400-401, was a mandatory-benefits case, and it thus addressed the separate question of whether a no-fault insurer could raise the common-law defense of fraud in the procurement of the policy to a claim for coverage mandated by the no-fault act or whether the Legislature abrogated that defense when it enacted the no-fault act. *Bazzi* cited *Titan* to support its analysis of this issue, even though *Titan* did not involve the issue of whether the common-law defense of fraud was abrogated by the mandatory coverage provisions of the no-fault act (and logically could not have involved that issue because it did not involve a claim for such benefits). *Id*. at 400, citing *Titan*, 491 Mich at 554-555. *Bazzi* also cited a more common approach for deciding this issue, asking whether the Legislature clearly sought to abrogate the common law. See *Bazzi*, 502 Mich at 400 ("When the Legislature intends to limit the common-law remedies available to an insurer for misrepresentation or fraud, that intent is clearly reflected in the language employed in the statute."); see also *People v Moreno*, 491 Mich 38, 41; 814 NW2d 624 (2012) ("While the Legislature has the authority to modify the common law, it must do so by speaking in 'no uncertain terms.'") (citation omitted). Elsewhere, however, we have noted that

9

In this case, by contrast, we are confronted with a contractual fraud defense to a claim for coverage mandated by the no-fault act. The caselaw discussed above establishes that contractual terms are governed by the no-fault act, yet at the same time we have held that common-law defenses not abrogated by the no-fault act remain available in claims for mandatory coverage. The upshot is that insurers can avail themselves of both statutory defenses and common-law defenses that the no-fault act has not displaced.

It would make little sense to say that an insurer can invoke common-law defenses when sued but cannot place those defenses in its contract. By the same token, we have never indicated that an insurer's contract can go beyond either the statutory or common-law defenses and thereby limit mandatory coverage to a greater extent than either the statute or the common law. To allow such provisions would reduce the scope of the mandatory coverage required by the no-fault act, as supplemented by the common law. It would, in short, vitiate the act. This result is plainly prohibited by our longstanding caselaw that forbids parties from contracting to vitiate an insured's duty to promptly pay benefits as required by the no-fault act. See, e.g., *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588,

"[w]hether or not a statutory scheme preempts the common law" depends on legislative intent, and when that intent is manifested in "comprehensive legislation prescrib[ing] in detail a course of conduct to pursue and the parties and things affected, and designat[ing] specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter." *Millross v Plum Hollow Golf Club*, 429 Mich 178, 183; 413 NW2d 17 (1987).

We have never addressed the apparent tension between these standards in the no-fault context or directly addressed the broader claim of whether the no-fault act is sufficiently comprehensive for us to conclude that the Legislature intended it to supersede and replace all of the common law as it relates to mandatory benefits. Because the issue was not raised by the parties, however, we need not address it in the present case.

598; 648 NW2d 591 (2002) (holding that when a contractual provision "contravenes the requirements of the no-fault act by imposing some greater obligation upon one or another of the parties, [it] is, to that extent, invalid").[8] For these reasons, a provision in an insurance policy purporting to set forth defenses to mandatory coverage is only valid and enforceable to the extent it contains statutory defenses or common-law defenses that have not been abrogated.

The question we are left with is whether Meemic's contract-based fraud defense is available under the no-fault act or whether it is a common-law defense that has not been abrogated. If the contractual defense is properly derived from either source, it is valid; if not, then it goes beyond what Meemic can assert to avoid mandatory coverage and is invalid and unenforceable.

## IV. APPLICATION

First, Meemic does not assert a statutory defense. The no-fault act permits an insurer to avoid coverage of PIP benefits under certain enumerated circumstances. MCL 500.3113 lists several of these circumstances, including, for example, when a person willingly operates an unlawfully taken vehicle and when a person was operating a vehicle as to which

---

[8] The concurrence's preoccupation with *Cruz* is a bit odd. In the concurrence's telling, our opinion is "an unwarranted departure" from something it calls "the *Cruz* standard." But our opinion does not depart from *Cruz*—to the contrary, it is the first from our Court to apply *Cruz*'s substantive holding.

11

he or she was an excluded operator.[9]  The no-fault act, however, does not provide a fraud

defense to PIP coverage, so Meemic's antifraud defense is not statutory.[10]

---

[9] MCL 500.3113 provides:

> A person is not entitled to be paid personal protection insurance benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:
>
> (a) The person was willingly operating or willingly using a motor vehicle or motorcycle that was taken unlawfully, and the person knew or should have known that the motor vehicle or motorcycle was taken unlawfully.
>
> (b) The person was the owner or registrant of a motor vehicle or motorcycle involved in the accident with respect to which the security required by section 3101 or 3103 was not in effect.
>
> (c) The person was not a resident of this state, was an occupant of a motor vehicle or motorcycle not registered in this state, and the motor vehicle or motorcycle was not insured by an insurer that has filed a certification in compliance with section 3163.
>
> (d) The person was operating a motor vehicle or motorcycle as to which he or she was named as an excluded operator as allowed under section 3009(2).
>
> (e) The person was the owner or operator of a motor vehicle for which coverage was excluded under a policy exclusion authorized under section 3017.

MCL 500.3017(1)(b) also provides that an insurer may exclude PIP coverage for any injury that occurs while a transportation network driver is providing a prearranged ride.

[10] That is not to say that the no-fault act leaves insurers without recourse.  An insurer can reject fraudulent claims without rescinding the entire policy.  See generally *Shelton v Auto-Owners Ins Co*, 318 Mich App 648, 655; 899 NW2d 744 (2017).  In addition, an insurer may receive attorney fees "in defending against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."  MCL 500.3148(2).  And, in certain narrow circumstances, an insurer can seek to cancel the policy under MCL 500.3220.  For

Second, we must consider whether Meemic's fraud defense is available at common law.[11] As we explained in *Titan*, 491 Mich at 555, "Michigan's contract law recognizes several interrelated but distinct common-law doctrines—loosely aggregated under the rubric of 'fraud'—that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation."[12] The key phrase is "if a contract *is obtained* as a result of fraud or misrepresentation." *Id*. (emphasis added). At common law, the defrauded party could only seek rescission, or avoidance of the transaction, if the fraud

_____

the reasons discussed later in this opinion, however, neither of those statutes is relevant or applicable to this case.

[11] It must be emphasized that this analysis is not about whether any common-law defense may be available to Meemic. Rather, we are assessing Meemic's defense through the lens of the antifraud provision in the policy. But as explained, our caselaw limits contract defenses to those available under the no-fault act or the common law. Thus, contractual language in an insurance policy might very well mean something different than the common law—but, as discussed, if it purports to provide the insurer a new or more robust defense outside the range of available statutory and common-law defenses it would circumvent the statute as read in light of the common law and would be, "to that extent, invalid." *Cruz*, 466 Mich at 598.

For that reason, we agree with Meemic's assertion that it is not seeking equitable relief or bringing an independent rescission action; it is simply trying to enforce its contract defense. But because that contract is valid only if it provides for relief that would be available under an unabrogated common-law defense, we must examine its request to see whether it matches with those common-law defenses. Here, as discussed more below, rescission is the closest common-law analogue to Meemic's contract defense.

[12] The party asserting actionable fraud must set forth the following elements:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. [*Titan*, 491 Mich at 555 (quotation marks and citation omitted).]

13

related to the inducement to or inception of the contract.  Dobbs, Remedies (2d ed, abrg),

§ 9.5, p 716.[13]  The rationale for this rule is that "[o]ne who has been fraudulently induced

---

[13] The sources supporting this rule are numerous.  See, e.g., *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 538 n 15; 872 NW2d 412 (2015) ("When a party fraudulently induces another party to enter into a contract, that contract is voidable at the option of the defrauded party . . . ."); *Berg v Hessey*, 268 Mich 599, 605; 256 NW 562 (1934) ("Rescission is not a vent for bad bargains unless induced by fraud . . . ."); *Cole v Oatman*, 234 Mich 128, 129-130; 207 NW 839 (1926) ("Where a vendee claims that he had been defrauded in the purchase of property by misrepresentations as to its condition or value, . . . [h]e may rescind the contract . . . ."); *Galloway v Holmes*, 1 Doug 330, 336-337 (Mich, 1844) ("I am aware that many of the cases, and of the elementary books, frequently apply the term *void* to the class of contracts to which the one under consideration belongs, but they oftener, perhaps, and certainly with more propriety, employ language which indicates their true character; as, that a party lured into a contract by the fraud of another, may *disregard*, may *disaffirm*, may *treat as void* the contract . . . ."); Geisler, *Proof of Fraudulent Inducement of a Contract and Entitlement to Remedies*, 48 Am Jur Proof of Facts 3d 329 (Mar 2020 update), § 1 ("Essentially, 'fraudulent inducement' occurs when a party to a contract was induced to enter into that contract by fraud of the other party. . . . 'Fraudulent inducement' relates to the accuracy and truthfulness of the discussions and negotiations of the parties prior to the contractual agreement and does not necessarily imply that a party has failed to perform its contractual duties.") (paragraph structure omitted); Dobbs, § 9.5, p 716 ("Fraud in inducing the *formation* of an agreement . . . warrants rescission or damages[.]"); 1 Restatement Contracts, 2d, § 164, comment *c*, p 446 ("No legal effect flows from either a non-fraudulent or a fraudulent misrepresentation unless it induces action by the recipient, that is, unless he manifests his assent to the contract in reliance on it."); Black, 1 *Rescission of Contracts and Cancellation of Written Instruments* (1916), § 20, p 37 ("It is a general rule that a party who has been induced to enter into any contract, obligation, or engagement by means of fraud, deceit, artifice, or trickery practised upon him by the opposite party, and who would not have placed himself in the situation in which he now is, if it had not been for the fraud or deceit, will be entitled to rescind the contract and demand a restoration of the status quo, and may have the aid of a court of equity to accomplish this purpose."); *id*. at § 24, pp 47-49 ("And further, it is necessary that the fraud, artifice, or representation should have been a material inducement to the contract. . . . Further, the fraud must have been inherent in, or at least contemporary with, the very transaction which is sought to be set aside. . . . [T]here must be fraud executed at the time of making the contract or relating to a state of affairs then existing.") (paragraph structure omitted); *id*. at § 36, pp 87-88 ("To be available as ground for the rescission of a contract or obligation, it is necessary that the fraud alleged to have been practised by one party upon the other should have been effective

14

to enter into a contract has not assented to the agreement since the fraudulent conduct precludes the requisite mutual assent" to form a contract. 26 Williston, Contracts (4th ed), § 69:1, p 497.[14] "Where mutual assent does not exist, a contract does not exist." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003).

This is not to suggest that a contractual provision that rescinds a contract because of postprocurement fraud is invalid in all circumstances. At common law, a contract might

---

in deceiving or misleading him and also in inducing him to enter into the contract or assume the obligation.").

Both of the two relevant forms of common-law fraud focus on conduct or circumstances at the contract's inception. "Fraudulent inducement" generally requires misrepresentations that induce a party to enter a contract, Geisler, § 1, whereas "fraud in the factum" " 'is[] the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents," *Langley v Fed Deposit Ins Corp*, 484 US 86, 93; 108 S Ct 396; 98 L Ed 2d 340 (1987). See also *Black's Law Dictionary* (10th ed) (defining "fraud in the factum" as occurring when the contract "as actually executed differs from the one intended for execution by the person who executes it" or when it otherwise lacks "legal existence" and defining "fraud in the inducement" as "occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved"); Farnsworth, *Contracts* (4th ed), § 4.10, p 236 (explaining that fraud in the inducement "goes only to the 'inducement,' " such as a misrepresentation of the quality of goods, while fraud in the factum (or fraudulent execution) relates "to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect").

[14] This explanation is also reflected in the Restatement (Second) of Contracts, which states, "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement Contracts, § 164(1), p 445 (emphasis omitted). We have likewise relied on this line of reasoning. See *Otto Baedeker & Assoc, Inc v Hamtramck State Bank*, 257 Mich 435, 441; 241 NW 249 (1932) ("The testimony would also justify the jury in finding that . . . defendant was deceived by plaintiff's trick [i.e., fraud] into executing the instrument without reading it and, therefore, that the minds of the parties did not meet on a contract.").

15

also be rescinded because of a party's failure to " 'perform a substantial part of the contract or one of its essential items[.]' " *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 510; 885 NW2d 861 (2016), quoting *Rosenthal v Triangle Dev Co*, 261 Mich 462, 463; 246 NW 182 (1933).[15]  Thus, a postprocurement fraud clause that rescinds a contract would be valid as applied to a party's failure to perform a substantial part of the contract or one of its essential terms.  Generally, however, the mere breach of a contract would not entitle the injured party to avoid the contract at common law.  See *Abbate v Shelden Land Co*, 303 Mich 657, 666; 7 NW2d 97 (1942) ("It is not every partial failure to comply with the terms of a contract by one party which will entitle the other party to abandon the contract at once.") (quotation marks and citations omitted).  Rather, "facts which will ordinarily warrant the rescission of a contract must have existed at the time the contract was made." 1 Black, *Rescission of Contracts and Cancellation of Written Instruments* (1916), § 5, p 8.[16]

---

[15] The Court of Appeals has upheld a fraud-exclusion provision when the fraud related to proof of loss on a claim rather than fraud in the procurement or execution of the policy. See *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 425; 864 NW2d 609 (2014); but see *Shelton*, 318 Mich App 648, 652-655; 899 NW2d 744 (2017) (limiting *Bahri* to when the claimant is an insured under the defendant's policy).  A leading treatise has explained that "to avoid a policy on the ground of fraud or false swearing in the proof of loss, the statement in question must be material."  13A Couch, Insurance, 3d (2019 rev ed), § 197:18, pp 48-49.  In this case, however, because there is no allegation of fraud in relation to Justin's claim for benefits, the Court need not address the issue of whether and to what extent fraud related to proof of loss can justify voiding the policy.  Moreover, because this case involves fraud by someone other than the claim beneficiary, the Court need not address whether a clause voiding a policy for postprocurement fraud would be valid as applied to fraud by an individual who is *both* a policyholder and the claim beneficiary.

[16] At common law, parties to a contract could specify the grounds for rescission, including fraud, and establish their scope in the contract.  See, e.g., *Crane v O'Reiley*, 8 Mich 312, 315-316 (1860) (enforcing a provision in a contract that allowed one party to void the

16

In this case, Meemic seeks to enforce a sweeping antifraud provision against the claim made by Justin, who was neither a party to the insurance contract nor a beneficiary of the claim allegedly obtained by fraud. As noted, the provision purports to void the entire policy if any "insured person" misrepresents a material fact or circumstance "relating to" either the "insurance," the "[a]pplication," "[o]r any claim made under it." And "insured person" is defined broadly such that the fraudulent actor need not be the person receiving benefits under the policy—indeed an insured person can also be "any person" occupying the car or any other person injured as a result of an accident involving the insured motor vehicle while not occupying any motor vehicle who is entitled to coverage. This means that under the contract's terms, Meemic could terminate benefit payments to Justin on the basis of the fraudulent activity of anyone who happened to be in or out of the car and entitled to claim under the policy, and the activity could occur years after the policy was entered and relate to any claim or simply to the "insurance."

As the Court of Appeals recognized, the fraudulent activity at issue here did not relate to the inception of the contract. The fraudulent attendant-care bills submitted by Justin's parents neither induced Meemic to enter into the policy nor deceived Meemic as

---

contract upon the default of the other). This freedom to define fraud is not, however, part of the common law that remains available to the insurer or the insured. If it were otherwise, the parties could contract around the statute itself, treating its mandatory provisions as negotiable. Our caselaw, as already explained, has ruled out such an approach. See, e.g., *Cruz*, 466 Mich at 598 (explaining that parties cannot, by contract, place greater requirements on the parties than those that are required by the statute). Nor do we believe that *Marquis* and *Bazzi*, by permitting certain common-law rules to remain in place, meant to introduce a Trojan horse that would enable the parties to reach agreements in contravention of the statute or the well-defined common-law defenses themselves.

17

to the contents of the policy.[17]  Meemic could not possibly have relied on any fraudulent

misrepresentations when it agreed to insure the Fortsons in 2009 because, at the time, they

had not yet made any of the alleged misrepresentations.[18]  And there has been no argument

or showing that the misrepresentations in this case constituted a failure to perform a

substantial part of the contract or an essential term, such that Meemic could obtain

rescission instead of bringing an action for damages.  In short, Meemic's contract-based

fraud defense fails because it is not the type of common-law fraud that would allow for

rescission.[19]

---

[17] Contrary to the fears expressed in Judge CAMERON's dissent, the correct framework for deciding this case has nothing to do with the now-abrogated innocent-third-party rule.  See *Meemic Ins Co*, 324 Mich App at 485-487 (CAMERON, J., dissenting).  The Court of Appeals decision here came before this Court's resolution of *Bazzi*, which, as explained, clarified that the criterion for the decision is whether the defense being claimed is available under the no-fault act or under common law that has not been displaced by that act.  The dispositive question in this case turns upon the nature of the common-law fraud defense—specifically, that it must relate to the contract's inception—which is irrelevant to Justin's status as a third party.

[18] Even assuming that fraud related to the proof of loss on a claim occurring after the contract was signed could justify rescission, none of the fraudulent acts here pertained to Justin's claim itself or any proof of loss on his part.

[19] Even if the common-law equitable remedy of rescission were available to Meemic, to the extent the policy purports to entitle Meemic to rescission as a matter of right (i.e., without balancing the equities), it would exceed the limits of the common law.  To the extent a claim for rescission is "equitable in nature, it 'is not strictly a matter of right' but is granted only in 'the sound discretion of the court.' " *Bazzi*, 502 Mich at 409, quoting *Amster v Stratton*, 259 Mich 683, 686; 244 NW 201 (1932).  Therefore, before granting rescission, a court must "balance the equities," including by considering the interests of third parties who did not commit the fraud.  *Bazzi*, 502 Mich at 410-411 (quotation marks and citation omitted).

Before they were merged, proceedings in equity and law were distinct, with different rules and procedures in each.  See Mich Const 1963, art 6, § 5.  Although the distinctions have been erased for most purposes, *id*., the differences sometimes crop up in

The concurrence produces more heat than light. As best we can tell, it sees this as a simple case that can be resolved by reference to a statute about canceling insurance policies—MCL 500.3220—that no one has cited and that everyone would agree does not apply. If only our task were so easy! But contrary to the concurrence, we do not believe that MCL 500.3220 is relevant to this case for the following reasons.

First, Meemic does not seek cancellation of the policy under MCL 500.3220(a), which is not surprising because (1) by its terms, the statute does not permit cancellation on the facts of this case, as the concurrence recognizes,[20] and (2) as noted above, Meemic has

discussions of the common law. Such is the case here. Although equitable rescission was at issue in *Bazzi* and there was, accordingly, no need to differentiate common-law practices in equity and law, it is worth noting here that courts at law have also permitted rescission as a legal remedy. This form of relief was hedged with formalities, most notably that the plaintiff had to "tender to the other party, as a precondition of suit, specific restitution of everything received under the contract." 2 Restatement Restitution, 3d, § 54, comment *b*, p 268; see also *Chaffee v Raymond*, 241 Mich 392, 394-395; 217 NW 22 (1928) ("In an action at law, based on rescission, a tender is a prerequisite. . . . In equity, however, the rule is not so rigid, for there the bill must make profert of return of what has been received, and the decree will place the parties *in status quo*, as far as possible."); *Witte v Hobolth*, 224 Mich 286, 290; 195 NW 82 (1923) ("A bill in equity praying rescission proceeds on the theory that there has been no rescission, not on the theory that rescission has already been accomplished. Were plaintiff to sue at law for the money he paid defendant, he should, before suit, restore, or tender restoration of, the property he received, that by his own act he thus may have legal right and title to the money."). According to the Restatement, the formalities gave courts at law considerable discretion, almost akin to that wielded by equity courts. Restatement Restitution & Unjust Enrichment, § 54, comment *b*, p 268. In any event, Meemic's contract did not require presuit tender, nor is there any evidence that Meemic made such a tender here. Thus, Meemic has not invoked rescission at law, and any distinction between legal and equitable remedy is irrelevant to the outcome.

[20] Section 3220(a) provides, in pertinent part, "Subject to the following provisions no insurer licensed to write automobile liability coverage, after a policy has been in effect 55 days or if the policy is a renewal, effective immediately, shall cancel a policy of automobile liability insurance except for any 1 or more of the following reasons . . . [t]hat during the

19

already canceled the policy for unrelated reasons, see note 3 of this opinion. Second, apart from the statute, cancellation is not even the type of remedy Meemic is seeking. As the concurrence itself recognizes, cancellation applies only prospectively and thus leaves in place all claims that vested before the cancellation. See *post* at 10 n 22. See also *Titan*, 491 Mich at 567; 2 Couch, Insurance, 3d (2010 rev ed), § 30:25, pp 53-55. Here, Justin's rights vested when he suffered the injuries that left him in need of attendant care, and canceling the policy now would not relieve Meemic from liability. Rather, in the language of the antifraud provision, Meemic seeks to "void" coverage and cease payment of Justin's PIP benefits. In other words, Meemic wants to rescind the policy to the extent it requires Meemic pay on this claim, meaning it wants to void the relevant policy provisions at least from the time the claim arose, if not from the policy's inception.[21]

---

55 days following the date of original issue thereof the risk is unacceptable to the insurer." (Paragraph structure omitted.) This provision clearly does not apply because it is undisputed that Meemic did not reassess the risk within the 55 days after the policy was issued. We also agree with the concurrence that MCL 500.3220(b), which provides for cancellation if the operator's license is suspended or revoked during the policy period, is plainly inapplicable to the fraud defense Meemic is raising now.

[21] Contrary to the concurrence, other courts including the Court of Appeals below, have interpreted a contractual provision allowing a party to "void" a contract as providing for rescission. See *Meemic*, 324 Mich App at 477 n 1; see also *Great American Reserve Ins Co of Dallas v Strain*, 377 P2d 583, 586-587 (Okla, 1962) ("The word 'void' admits of more than one meaning. A contract may be void in the sense of being illegal; if so, the obligation, being prohibited by law, is a nullity in its contemplation; hence incapable of affirmance, ratification and enforcement. In some context the word void may be construed as meaning merely voidable; that is, the contract continues in force and effect until its timely repudiation or rescission by an affirmative act of the party entitled to avoid the obligation. It is the latter meaning of the term void that the law attaches to a policy clause such as that under consideration. . . . Non-compliance with, or breach of, a condition such as that which defendant invoked in its defense does not operate to extinguish the policy or

20

Third, and finally, MCL 500.3220 does not abrogate common-law rescission in this context, a point the concurrence fails to grapple with or even acknowledge. In a stray line tucked in a footnote, the concurrence surmises that because MCL 500.3220 prevents Meemic from canceling the contract, it must also preclude it "from seeking a more robust remedy that would necessarily include cancellation, such as rescission." *Post* at 11 n 22. But we have already rejected this argument. In *Titan*, we noted that rescission "is conceptually different in its nature and in its breadth from [other contract remedies], and to interpret 'cancellation' as encompassing a broader range of contractual remedies is simply without basis in the [no-fault] statute." *Titan*, 491 Mich at 568. More generally, *Titan* explained:

> We agree with the Court of Appeals that MCL 500.3220(a) shows an intent to allow insurers only a limited period during which to reassess the risk after the formation of a policy and when the risk is deemed unacceptable to "cancel" the policy. However, we disagree that when an insurer elects *not* to reassess the risk and later uncovers fraud, it is somehow precluded from pursuing traditional legal and equitable remedies in response. [*Id*. at 566-567.]

In *Bazzi*, 502 Mich at 401, the Court applied this approach to a claim for mandatory PIP benefits, ("In this case, however, the plain language of the no-fault act does not preclude

render it ineffective and void. The law requires an affirmative act of rescission on the part of the insurer in order to avoid its liability.") (paragraph structure omitted).

It seems to us an unremarkable proposition that an insurer may seek to rescind a policy that is voidable on the basis of fraud. See, e.g., *Northland Radiology, Inc v USAA Cas Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued June 18, 2020 (Docket No. 346345), p 6 ("When an insurer is induced by fraud to issue a policy of insurance, the fraud renders the policy voidable at the option of the insurer. *Bazzi*, 502 Mich at 408. Thus, an insurer may rescind a policy on the basis of a material misrepresentation made in an application for no-fault insurance. *21st Century Premier* [*Ins Co v Zufelt*, 315 Mich App 437, 445; 889 NW2d 759 (2016)].").

21

or otherwise limit an insurer's ability to rescind a policy on the basis of fraud."), as it had done before in *Marquis*, 444 Mich at 652 (applying common-law defenses to mandatory work-loss benefits under the no-fault act).

The concurrence fails to recognize that its theory directly conflicts with *Titan*, which rejected the notion that MCL 500.3220 abrogated the common-law defense of rescission. Nor does the concurrence consider the broader line of caselaw, including *Bazzi* and *Marquis*, which has clearly held that fraud and other common-law defenses were not abrogated.[22]  Also missing from the concurrence is any textual analysis to support its conclusion, which runs counter to the longstanding interpretive principle that legislative intent to abrogate the common law must be "clearly reflected in the language employed in the statute." *Bazzi*, 502 Mich at 400.  See also *People v Moreno*, 491 Mich 38, 41; 814

---

[22] The concurrence notes that *Bazzi* and *Titan* addressed fraud in the procurement, rather than fraud in the proof of loss.  *Post* at 13 n 27.  But the concurrence fails to explain why this distinction helps answer whether the common law has been abrogated.  Nothing in the analysis or logic of those cases suggested they applied only to procurement fraud.  Even so, the concurrence's distinction does not account for *Marquis*, 444 Mich at 650-655, which applied a common-law defense (mitigation of damages) to postprocurement events. By disregarding the full scope of these opinions, particularly *Bazzi* and *Marquis*, the concurrence overlooks why we must consider whether Meemic's antifraud provision invokes an unabrogated common-law defense.  Those cases clearly establish that even in the context of a case involving mandatory no-fault benefits, such defenses remain available to insurers.  Thus, if under the common law Meemic could rescind the contract on the basis of fraud, *Bazzi* and *Marquis* require us to allow that defense here (whether raised as an independent common-law defense or as a contract-based defense).  The only way to avoid this conclusion is to conclude, contrary to *Bazzi* and *Marquis*, that the no-fault act abrogated these fraud-based common-law defenses.  The concurrence's approach would overrule these cases *sub silentio*.

NW2d 624 (2012) ("While the Legislature has the authority to modify the common law, it must do so by speaking in 'no uncertain terms.' ") (citation omitted).[23]

The upshot of the concurrence's approach is that with the possible exception of the procurement fraud in *Bazzi*, all other common-law defenses to fraud in this context would have been supplanted by statute.[24] As we noted earlier in this opinion, the no-fault act's abrogation of the common law might merit reexamination, but the concurrence does not offer such an analysis, nor would it be appropriate to do so in this case. In the end, we can only conclude that the concurrence's theory is a departure from a number of our binding precedents in this area.[25]

---

[23] The concurrence also misreads MCL 500.3148(2), as enacted by 1972 PA 294, which stated (and still states, in the current version) that an insurer "may" be awarded attorney fees incurred defending against a claim that "was in some respect fraudulent or . . . excessive" and that those fees can be offset against any PIP benefits "[t]o the extent" such benefits are owed. The concurrence notes that this provision does not expressly permit an insurer to void the policy. But the concurrence offers nothing to support its apparent inference that the lack of express permission is tantamount to an affirmative prohibition on voiding policies based on fraud. Nothing in the statute's qualified and conditional language suggests that a defrauded insurer is limited only to compensatory attorney fees and only if it decides to contest a fraudulent claim. And, as with MCL 500.3220, the concurrence makes no effort to analyze whether MCL 500.3148 has abrogated any relevant common-law defenses against fraud. But for the reasons just stated, this provision does not contradict (but merely supplements) a fraud defense.

[24] The effect would be to drastically limit the common-law remedies for fraud. For example, a common-law defense of rescission for a substantial breach would be unavailable to an insurer in cases like the present. All that an insurer could hope for, even if it canceled the contract, would be to offset attorney fees from its payments of benefits *if* it disputed the fraudulent claim.

[25] We agree with the concurrence that the parties' briefing in this Court ranged across various topics, some of which are not pertinent to the resolution of this case. The parties also, however, raised critical issues that are squarely within the scope of our analysis, including the basis for the antifraud provision, i.e., whether it was an equitable remedy.

## VI. CONCLUSION

For the reasons set forth in this opinion, we hold that Meemic's contractual antifraud provision is invalid and unenforceable because it is not based on a statutory or unabrogated common-law defense. Therefore, we affirm the Court of Appeals in result only, vacate its opinion, and remand the case to the trial court for further proceedings consistent with this opinion.

David F. Viviano
Bridget M. McCormack
Stephen J. Markman
Richard H. Bernstein
Megan K. Cavanagh

---

More importantly, the overarching issue in this case is the enforceability of the antifraud provision in the policy. That is the issue we address, and we do so by analyzing the caselaw and authorities presented by the parties and discussed by the Court of Appeals. In contrast, the concurrence resolves the case by reference to a statute, MCL 500.3220, that neither party nor the Court of Appeals thought relevant. And, as explained, its approach would cause us to overrule or disregard our binding caselaw—hardly the "narrow and limited" opinion it purports to set forth.

STATE OF MICHIGAN

SUPREME COURT

MEEMIC INSURANCE COMPANY,

        Plaintiff/Counterdefendant-
        Appellant,

v                                          No. 158302

LOUISE M. FORTSON and RICHARD A.
FORTSON, Individually and as Conservator
for JUSTIN FORTSON,

        Defendants/Counterplaintiffs-
        Appellees.

_____

ZAHRA, J. (*concurring in the judgment*).

The majority reaches the correct result in this case. I write separately because the

majority's opinion improperly suggests that our common law[1] and the no-fault act[2]

---

[1] The majority's noted reliance on this state's "closest common-law analogue" to the contract defense raised by Meemic—that is, rescission—is itself a telling admission that our common law does not control the disposition of this case. More telling is that the majority's alleged support for concluding that an insurance provision purporting to "void" an insurance policy actually means the common-law remedy of "rescission" of that insurance policy consists of the Court of Appeals' split decision in this very case and a 58-year-old Oklahoma case stating that "[t]he word 'void' admits of more than one meaning." *Great American Reserve Ins Co of Dallas v Strain*, 377 P2d 583, 586-587 (Okla, 1962). And in fact, the Oklahoma court held that a provision seeking to "void" a policy, if valid, would only render the policy "merely voidable," which, of course, would preclude the remedy of rescission. *Id*. at 587. The parties in this case agree there is a valid contract, and Meemic is not seeking to restore the parties to their precontractual positions, which would be the result of rescission.

[2] MCL 500.3101 *et seq*.

represent the *exclusive* authorities employed to determine the validity of a provision in a no-fault policy. In my view, this approach is an unwarranted departure from our accepted and proven approach in like cases, which is "to construe contracts that are potentially in conflict with a statute, and thus void as against public policy, [and] where reasonably possible, to harmonize them with the statute" (the *Cruz* standard).[3] I would reaffirm the *Cruz* standard, which allows courts to defer to duly approved no-fault policy provisions that facilitate the goals of the act and are harmonious with the Legislature's no-fault insurance regime. The majority's suggested departure from the *Cruz* standard unnecessarily creates a dichotomy within our established precedent that may chill insurers from submitting reasonable and necessary provisions to the executive agency to which the Legislature has delegated the authority to approve all no-fault insurance policies issued within the state. Many of these provisions are not mentioned by the no-fault act or recognized by the common law of this state. I reach the same result as the majority without relying on the majority's analysis of the state's common law. I would instead apply the

---

[3] *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 599; 648 NW2d 591 (2002). The majority questions my "preoccupation" with *Cruz* but then immediately claims its opinion "is the first from our Court to apply *Cruz*'s substantive holding." I admit to my "preoccupation" with the law of this state. So also does every member of the Court. I also confess that my preoccupation is often pronounced when the law involves an opinion from this Court, which has been oft-cited in our caselaw and by leading insurance treatises (interstate and intrastate alike), the most recent pointedly recognizing that "*Cruz v State Farm Mutual Auto Insurance Company* is commonly the main case used to argue that a contract clause conflicts with a statute." Hijazi, *A Survey of Michigan Assignment Law as it Relates to No-Fault Insurance Contracts: Post-Covenant*, 64 Wayne L Rev 817, 837 (2019). If the majority does actually embrace *Cruz*'s substantive holding as it claims, which I think it clearly does not, it would be the first time that *Cruz* was (mis)applied without addressing whether a contract clause conflicts with a statute.

*Cruz* standard and hold that the fraud-exclusion provision at issue here is inconsistent with the no-fault act and, therefore, void as against Michigan public policy.

## I. FACTS AND PROCEDURAL HISTORY

In 2014, Meemic brought the instant action in the Berrien Circuit Court, seeking a declaration that it was contractually entitled to void the no-fault insurance policy it had issued to Richard and Louise Fortson. This policy was in full force and effect in September 2009 when their son, Justin, who resided with them, was involved in a serious automobile accident. As a result of the accident, Justin needed full-time attendant-care services for which he claimed benefits under the no-fault insurance policy issued by Meemic to his parents. Meemic paid for these services, which were performed by Justin's mother, a named insured under the policy. At some point, Louise allegedly sought to be paid for services she did not provide to Justin; Meemic filed the instant suit, seeking to void the policy on the basis of the following policy provision:

> **22. CONCEALMENT OR FRAUD**
>
> This entire Policy is void if any **insured person** has intentionally concealed or misrepresented any material fact or circumstance relating to:
>
> A. This insurance;
>
> B. The Application for it;
>
> C. Or any claim made under it.

The trial court initially denied Meemic's motion for summary disposition, citing the "innocent-third-party rule, which precludes an insurer from rescinding an insurance policy

3

procured through fraud when there is a claim involving an innocent third party."[4] Meemic moved for reconsideration after the Court of Appeals issued its decision in *Bazzi v Sentinel Ins Co*,[5] which held that the innocent-third-party rule had been abolished by our decision in *Titan Ins Co v Hyten*.[6] The trial court agreed with Meemic's argument that because the innocent-third-party rule had been abolished, Meemic was not precluded from raising a fraud defense at any point in time regardless of whether Justin was an innocent third party. On March 14, 2017, the trial court entered an order granting summary disposition in favor of Meemic.

The Fortsons appealed, arguing, in part, that the trial court erred by relying on the Court of Appeals decision in *Bazzi* because the factual basis for the claim of fraud in *Bazzi* related to an insured's fraudulent procurement of the insurance policy.[7] In contrast, the insurance policy in this case was properly procured and was valid when Justin filed his claim. At this point, the Fortsons maintained, the no-fault act controls and mandates that Meemic provide Justin with statutory no-fault benefits.

In a published opinion, the Court of Appeals reversed the trial court's order granting summary disposition to Meemic.[8] In so doing, the Court of Appeals considered but found

---

[4] *Bazzi v Sentinel Ins Co*, 502 Mich 390, 396; 919 NW2d 20 (2018).

[5] *Bazzi v Sentinel Ins Co*, 315 Mich App 763, 767-768, 771; 891 NW2d 13 (2016), aff'd in part and rev'd in part 502 Mich 390 (2018).

[6] *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012).

[7] *Bazzi*, 315 Mich App at 768.

[8] *Meemic Ins Co v Fortson*, 324 Mich App 467, 471, 484; 922 NW2d 154 (2018).

inapplicable its decision in *Bazzi*, reasoning that the fraud defense was not available to void or rescind the no-fault policy at issue here because, unlike in *Bazzi*,[9] the Fortsons' alleged fraud did not arise in the procurement of the policy.[10] The Court of Appeals next considered the fraud-exclusion provision in Meemic's policy that purports to void the entire policy if any insured person has intentionally concealed or misrepresented any material fact or circumstance relating to, in pertinent part, "[t]his insurance" or "any claim made under it."[11] The Court of Appeals held that "[b]ecause MCL 500.3114(1) mandates coverage for a resident relative domiciled with a policyholder, the fraud-exclusion provision, as applied to Justin's claim, is invalid because it conflicts with Justin's statutory right to receive benefits under MCL 500.3114(1)."[12]

Meemic filed an application for leave to appeal in this Court, asking us to decide, among other things,[13] whether the innocent-third-party rule remains viable when the fraud

---

[9] *Bazzi*, 315 Mich App 763.

[10] *Fortson*, 324 Mich App at 475-476.

[11] *Id*. at 477-478.

[12] *Id*. at 478-479. The Court of Appeals held that under the plain language of the policy, "Louise and Richard were not insured persons under the policy when they committed fraud, so the fraud-exclusion clause is inapplicable and cannot be used to void the policy and deny Justin's claim." *Id*. at 484. I find the Court of Appeals' alternative conclusion that Richard and Louise were no longer "insured parties" under the policy to be questionable. Nonetheless, I would not address this argument given the result reached in this case.

[13] The application for leave to appeal also asked this Court to determine (1) whether a person's status as an insured person under a policy may be ignored in order to avoid the application of a fraud-exclusion provision and (2) whether the cancellation of a no-fault policy after a loss occurs nullifies the policy's terms and conditions applicable to the loss.

5

occurs in the claim for benefits, as opposed to in the application for insurance. We granted the application,[14] presumably to answer this question.[15]

## II. ANALYSIS

The majority opinion "hold[s] that such [fraud-exclusion] provisions are valid when based on a defense to mandatory coverage provided in the no-fault act itself or on a common-law defense that has not been abrogated by the act. Because Meemic's fraud defense is grounded on neither the no-fault act nor the common law, it is invalid and unenforceable." This holding is overly broad. The scheme adopted by the majority for determining the viability of contract language in a no-fault insurance policy may place

Because I would render unenforceable the fraud-exclusion provision of the policy upon which the above two issues are premised, Meemic cannot prevail on the remaining issues.

[14] *Meemic Ins Co v Fortson*, 503 Mich 1031 (2019).

[15] Although Meemic's application for leave to appeal asks us to declare that "the innocent third party rule does not exempt Justin from the effect of the [fraud-exclusion] provision of the policy under which he claims benefits," nothing in the Court of Appeals opinion reversing the trial court even remotely suggests that it was relying on this now-abolished equitable doctrine. (Formatting altered.) Meemic has presented us with a straw-man argument. Accordingly, leave to appeal was improvidently granted in this case, and an order dismissing this appeal or a peremptory order would be appropriate. At the least, the Court could order supplemental briefing. Nonetheless, the majority chooses to answer a question that has nothing to do with the innocent-third-party rule. Rather, the Court decides today that the fraud-exclusion provision in Meemic's no-fault insurance policy cannot be applied to void statutory obligations owed under the validly procured insurance contract issued in this case because the provision has no basis in statute or the common law. Neither the oral arguments nor the briefs presented by the litigants addressed the basis on which the majority opinion is premised. To the extent the Court answers questions that are not briefed or argued by the parties, the Court's opinion should be narrow and limited to the unique facts of the case. This is best accomplished in the instant case by simply relying on *Cruz* and concluding that the provision under review is void as against Michigan public policy.

6

unwarranted constraints on the fundamental right to contract. The majority opinion gives little or no weight to the way in which we have traditionally interpreted no-fault insurance contracts. Ordinarily, we would apply the *Cruz* standard, which is to say that we are "to construe contracts that are potentially in conflict with a statute, . . . where reasonably possible, [in such a way as] to harmonize them with the statute."[16] The majority opinion implicitly emasculates the *Cruz* standard by only asking whether the provision at issue is expressly permitted under the no-fault act or the common law.

The majority opinion also states that "one thing that is not open to debate is that the act governs the coverages it mandates, and the insurance policy controls coverages that are optional . . . ." The apparent implication of this dichotomy is that the common law and the no-fault act represent the *exclusive* authorities used to determine the validity of a provision in a no-fault policy, with no room for the policy language to do any work.[17]

---

[16] *Cruz*, 466 Mich at 599.

[17] The provisions of an insurance policy are not arbitrary but intended to allow a lay person to read and understand the policy. See MCL 500.2236(3). As an example, in the wake of the statutory overhaul of the no-fault act, see 2019 PA 20 and 2019 PA 21, the Director of the Department of Insurance and Financial Services recently issued Order No. 19-048-M, concluding that "[i]mplementation of statutory amendments that affect the scope of coverage required to be provided under an insurance policy through reliance on a 'conformity to law clause' would violate . . . MCL 500.2236(5), as reliance upon an insurance policy provision that 'unreasonably and deceptively affect[s] the risk purported to be assumed in the general coverage of the policy.'" Department of Insurance and Financial Services, *In re Requirements to File Forms and Rates Prior to Implementing Public Acts 21 and 22*, Order No. 19-048-M (September 20, 2019), p 3 (second alteration in original). While the new amendments are not applicable to this case, the point remains that the language in a no-fault policy that conforms to the act is not surplusage and cannot simply be swapped out with a "conformity of the law" clause. "[T]he Legislature has assigned the responsibility of evaluating the 'reasonableness' of an insurance contract to the person within the executive branch charged with reviewing and approving insurance policies: the Commissioner of Insurance." *Rory v Continental Ins Co*, 473 Mich 457, 475;

---

7

But this Court has clearly held that insurers may insert provisions into a no-fault policy that are not rooted in the common law or referred to in the no-fault act. For instance, in *Cruz*,[18] this Court considered the insertion of an examination under oath (EUO) provision into an insurance policy. The Court of Appeals "found that EUOs were precluded in the automobile no-fault insurance context because they were not mentioned in the act."[19] This Court disagreed and approved the insertion of EUOs "when used to facilitate the goals of the act and when they are harmonious with the Legislature's no-fault insurance regime[.]"[20]

---

703 NW2d 23 (2005). The commissioner, who is now referred to as the Director of the Department of Insurance and Financial Services, see 2014 PA 140, is obligated under MCL 500.2236(1) to determine that no-fault insurance policies conform with the act's requirements. MCL 500.2236(1) forbids the issuance of any insurance policy or indorsement "until a copy of the form is filed with the department of insurance and financial services and approved by the director of the department of insurance and financial services as conforming with the requirements of this act and not inconsistent with the law." As the *Cruz* Court noted, the director presumably undertakes this statutory obligation by "harmonizing agreed-upon contract terms with statutory requirements . . . ." *Cruz*, 466 Mich at 599 n 15. Moreover, it is highly unlikely that the language in a no-fault policy will ever mirror the language of the no-fault act. The language in a no-fault policy is subject to a "readability score" and various additional measures intended to allow a lay person to read and understand the policy. See MCL 500.2236(3). The director's decisions are subject to judicial review under MCL 500.244. The role of the director in approving policy language is also emasculated by the majority opinion, which relegates the approved policy language to the standard suggested in the majority opinion.

[18] *Cruz*, 466 Mich 588.

[19] *Id*. at 598, discussing the Court of Appeals' decision in *Cruz v State Farm Mut Auto Ins Co*, 241 Mich App 159; 614 NW2d 689 (2000).

[20] *Cruz*, 466 Mich at 598. To demonstrate the flexibility of the *Cruz* standard, I note that while the *Cruz* Court generally approved provisions regarding EUOs, the Court also determined under the facts of that case that the insurer's attempt to require the insured to submit to an EUO *as a condition precedent* to payment of no-fault personal protection

8

In my view, this Court need not delve into whether the no-fault act expressly permits the fraud-exclusion provision at issue in this case or whether this provision is drawn from common-law remedies and the extent to which, if at all, these remedies are abrogated by the common law to resolve this case. Indeed, even if the fraud-exclusion provision was accepted as a "contract-based fraud defense" that contemplates the remedy of "rescission" as the majority surmises, MCL 500.3220 would prohibit Meemic from canceling, let alone rescinding the policy in this case.[21] MCL 500.3220(b) is plainly not applicable, and Meemic has not argued, let alone proved, that an unacceptable risk had arisen within 55 days from the day the policy issued, which would have allowed it to cancel the policy under MCL 500.3220(a).[22] The majority clearly misunderstands the relevance of MCL 500.3220

insurance (PIP) benefits was impermissible under the *Cruz* standard because that application would vitiate the insurer's duty to pay benefits in a timely fashion as required by the statute. *Id*. at 600.

[21] MCL 500.3220 provides:

> Subject to the following provisions no insurer licensed to write automobile liability coverage, after a policy has been in effect 55 days or if the policy is a renewal, effective immediately, shall cancel a policy of automobile liability insurance except for any 1 or more of the following reasons:

> (a) That during the 55 days following the date of original issue thereof the risk is unacceptable to the insurer.

> (b) That the named insured or any other operator, either resident of the same household or who customarily operates an automobile insured under the policy has had his operator's license suspended during the policy period and the revocation or suspension has become final.

[22] The majority's holding is premised on an analysis of the right of rescission, the correctness and applicability of which I question. It is not immediately apparent to me that this case presents a question of rescission. Meemic most assuredly wants to void its

9

contractual obligations under the policy, but it has never sought to rescind the policy. And in this Court, Meemic has plainly and unequivocally stated both in its application for leave to appeal and in its brief that it is not seeking to rescind the policy.

The Restatement of Contracts, in noting the distinctions between various ways of putting an end to a contractual relationship, observes:

> Sometimes the parties to a contract that is at least partly executory on each side make an agreement under which each party agrees to discharge all of the other party's duties of performance. Such an agreement is called an "agreement of rescission" in this Restatement. . . . The term "agreement of rescission" is used in this Restatement to avoid confusion with the word "rescission," which courts sometimes use to refer to the exercise by one party of a power of avoidance. . . . An agreement of rescission differs from a "termination," which "occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach" and from a "cancellation," which "occurs when either party puts an end to the contract for breach by the other." [2 Restatement Contracts, 2d, § 283, comment *a*, p 390 (citation omitted).]

Other treatises offer somewhat different arrangements of these terms. One leading treatise explains:

> A rescission avoids the [policy] ab initio whereas a cancellation merely terminates the policy as of the time when the cancellation becomes effective. In other words, cancellation of a policy operates prospectively while rescission, in effect, operates retroactively to the very time that the policy came into existence[.] [2 Couch, Insurance, 3d (rev ed), § 30:3, p 10.]

In this case, all indications suggest that Meemic seeks to " 'put[] an end to the contract,' " not " 'for its breach' " but rather " 'pursuant to a power created by agreement' "—i.e., the fraud-exclusion language. Restatement, § 283, comment *a*, p 390 (citation omitted). If so, that would be a " 'termination.' " And as the Restatement notes, "if under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance . . . , that duty is discharged if the event occurs." Restatement, § 230(1), p 189 (formatting altered). Further, Meemic does not truly seek to void the policy *ab initio* such as a party seeking rescission would. After all, Meemic asks to be reimbursed for PIP benefits made in connection with fraudulent proofs of loss and to terminate future liability, but it does not seek reimbursement for all the PIP benefits it has paid retroactive to the very time that the policy came into existence.

And regardless of whether the fraud-exclusion provision is characterized as

10

in this case. Of course Meemic cannot now rely on this statute to cancel the policy. The statute provides a limited path to allow an insurer to cancel an insurance policy. Meemic failed to take advantage of this statutory path and instead now seeks to expand that limited path through a sweeping fraud exclusion. Because the no-fault act provides a very defined and limited path to canceling a policy, the fraud-exclusion provision in this case that permits Meemic to "void" or "cancel" the policy without following the limited statutory path to cancellation is inconsistent with MCL 500.3220, and unenforceable.[23]

And of course I appreciate that cancellation applies only prospectively and that canceling the policy now would not relieve Meemic from liability. That is precisely why Meemic's attempt to expand its ability to cancel the policy under the fraud-exclusion provision is inconsistent with MCL 500.3220 and, thus, impermissible. There can be no

allowing for "rescission" or "cancellation," the no-fault act expressly prevents Meemic from exercising this provision to cancel the policy, let alone from seeking a more robust remedy that would necessarily include cancellation, such as rescission. As we recognized in *Bazzi*:

> When the Legislature intends to limit the common-law remedies available to an insurer for misrepresentation or fraud, that intent is clearly reflected in the language employed in the statute. For example, MCL 500.3220—part of the no-fault act—"limits the ability of a licensed insurer to 'cancel' automobile coverage after a policy has been in effect for at least 55 days." [*Bazzi*, 502 Mich at 400-401 (citation omitted).]

Here, as earlier explained, there is simply no question that Meemic did not "cancel" the policy within 55 days of it being issued, and MCL 500.3220 plainly prohibits Meemic from canceling the policy thereafter. This result is reasonably drawn from the plain language of the no-fault act.

[23] Meemic's later cancellation of the policy for unrelated reasons shortly after the Fortsons had renewed the policy is simply not relevant.

11

real dispute that the cancellation of a policy does not entail the rescission of that policy, nor that the rescission of a policy does entail the cancellation of that policy. In sum, the majority's reliance on rescission is misplaced. In *Titan*, this Court expressed agreement with a Court of Appeals decision holding that "[r]escission is insufficiently similar to *cancellation* to support the conclusion that the Legislature's enactment of a statute controlling cancellation of an automobile insurance policy *without mentioning rescission demonstrates the Legislature's intent to preclude rescission.*"[24] Consistently with this understanding, and as explained in note 22 of this opinion, I believe that the word "void" as used in the fraud-exclusion provision is likewise "insufficiently similar to" "rescission" given that the meaning of "rescission" is distinct from the meaning of "void" because rescission "encompass[es] a broader range of contractual remedies . . . ."[25]

Last, I am not suggesting that "when an insurer elects *not* to reassess the risk and later uncovers fraud, it is somehow precluded from pursuing traditional legal and equitable remedies in response."[26] I am only saying that these legal and equitable remedies are not available if they are in conflict with a statute and cannot be reasonably harmonized with the statute.

---

[24] *Titan*, 491 Mich at 568 n 10, quoting *United Security Ins Co v Ins Comm'r*, 133 Mich App 38, 42; 348 NW2d 34 (1984) (quotation marks omitted; emphasis added; alteration in original).

[25] *Titan*, 491 Mich at 568 & n 10, quoting *United Security Ins Co*, 133 Mich App at 42 (quotation marks omitted).

[26] *Titan*, 491 Mich at 566-567.

Accordingly, we need only follow this Court's decision in *Cruz* and hold that because the contractual fraud-exclusion provision conflicts with the no-fault act, it is against public policy and, therefore, unenforceable.[27]

As mentioned, in *Cruz,* this Court addressed "whether the inclusion of an [EUO] provision in an automobile no-fault insurance policy is permitted under the Michigan no-fault insurance act."[28] The insurer took the "position that the parties could agree in their contract of insurance, notwithstanding the requirements of the statute regarding prompt payment of benefits, to condition the payment of benefits on the submission by [the insured] to an EUO."[29] The insured refused repeated requests to submit to the EUO, and because of this, the insurer denied, in relevant part, the insured's claims for personal protection insurance (PIP) benefits mandated under the no-fault act.[30]

The *Cruz* Court noted that "the no-fault act contains no reference either allowing or prohibiting examinations under oath."[31] The Court phrased the relevant legal question as "whether, given this silence, the inclusion of examination under oath provisions in no-fault

---

[27] I agree with the Court of Appeals that "because the fraud in this case was not fraud in the procurement of the policy and instead arose after the policy was issued," *Fortson*, 324 Mich App at 475-476, neither the Court of Appeals' decision in *Bazzi*, 315 Mich App 763, nor this Court's decision in *Titan*, 491 Mich 547, is controlling. For the same reason, this Court's subsequent decision on appeal in *Bazzi*, 502 Mich 390, is likewise not controlling.

[28] *Cruz*, 466 Mich at 590.

[29] *Id.* at 591.

[30] *Id.*

[31] *Id.* at 594.

automobile insurance policies is allowed."[32] The Court emphasized its duty "to construe contracts that are potentially in conflict with a statute, and thus void as against public policy . . . [so as] to harmonize them with the statute [where reasonably possible]."[33] The Court applied this rule as follows:

> [The insurer] and its insured could not contract to vitiate [the insurer]'s duty to pay benefits in a timely fashion as required by the statute. Once "reasonable proof of the fact and of the amount of loss sustained" was received by [the insurer], it had to pay benefits or be subject to the penalties. Because it is acknowledged that such proof was received, [the insurer's] duty to pay benefits to its insured began thirty days thereafter. To the degree that the contract is in conflict with the statute, it is contrary to public policy and, therefore, invalid.[34]

In my view, the *Cruz* standard presents the proper framework to address the question posed in this case. The fraud-exclusion provision purports to void all of Meemic's statutory duties with respect to Justin without any express or implied justification to do so under the no-fault act. The act clearly provides that an insurer is only responsible for those PIP benefits that are "reasonably necessary,"[35] and I would submit that a fraudulent charge is *ipso facto* neither reasonable nor necessary. Given that the Legislature expressly provided an insurer a limited right to challenge particular charges, there appears no reasonable basis on which the insurer can challenge *all* previous and future valid charges on the basis of a single fraudulent charge.

---

[32] *Id.*

[33] *Id.* at 599.

[34] *Id.* at 600-601.

[35] See MCL 500.3107, as amended by 2012 PA 542, effective January 2, 2013.

In addition, the language of the no-fault act suggests that an insured remains entitled to PIP benefits even after the insured has filed a fraudulent charge. Former MCL 500.3148(2) stated:

> An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation. To the extent that personal or property protection insurance benefits are then due *or thereafter come due to the claimant because of loss resulting from the injury on which the claim is based*, such a fee may be treated as an offset against such benefits; also, judgment may be entered against the claimant for any amount of a fee awarded against him and not offset in this way or otherwise paid. [MCL 500.3148(2), as enacted by 1972 PA 294 (emphasis added).]

This is the only provision in the no-fault act that addresses a claimant's fraudulent proof of loss for PIP benefits. And far from permitting an insurer to void the policy at this point, former MCL 500.3148(2) expressly contemplates that an insurer will continue to provide PIP benefits due "thereafter" "because of loss resulting from the injury on which the claim is based[.]" And to make clear that this claim is not an independent cause of action, former MCL 500.3148(2) also provides that the "fee may be treated as an offset against such benefits[.]" Because the no-fault act provides a remedy for fraudulent proofs of loss and contemplates the continuation of PIP benefits even though prior fraud has been proved, the fraud-exclusion provision in this case that would "void" a policy for that very reason contradicts the no-fault act and is unenforceable.

Moreover, the fraud-exclusion provision, which only inures to the benefit of an insurer, by no means facilitates the goal of the no-fault insurance system—" 'to provide victims of motor vehicle accidents with assured, adequate, and prompt reparation for

15

certain economic losses.' "[36]  In my opinion, the instant fraud-exclusion provision in many respects thwarts the goal of the no-fault act.  Indeed, the specter of having one's unlimited lifetime PIP benefits terminated because of fraudulent activity by anyone entitled to make a claim under the policy at any point in the future provides no meaningful assurance of reparation at all.

### III.  CONCLUSION

I concur in the result reached by the majority that the instant fraud-exclusion provision is unenforceable.  But unlike the majority, I would affirm the Court of Appeals decision on the basis of the *Cruz* standard and would hold that the fraud-exclusion provision is inconsistent with the no-fault act and, therefore, void as against public policy.

Brian K. Zahra
Elizabeth T. Clement

---

[36] *Cruz*, 466 Mich at 595, quoting *Shavers v Attorney General*, 402 Mich 554, 579; 267 NW2d 72 (1978).